UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
COOKEVILLE DIVISION

|  |  |  |
|---|---|---|
| COLLEEN C. DAVIS, | ) | |
| Plaintiff, | ) | |
|  | ) | |
| v. | ) | Civil Action No. 2:10-cv-0034 |
|  | ) | Judge Wiseman/Brown |
|  | ) | |
| MICHAEL ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| Defendant. | ) | |

To:     The Honorable Thomas Wiseman, Senior Judge

## REPORT AND RECOMMENDATION

This is a civil action filed pursuant to 42 U.S.C. § 405(g) to obtain judicial review of the final decision of the Commissioner of Social Security denying Plaintiff Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB"), as provided under Title XVI and Title II of the Social Security Act (the "Act"), as amended. Currently pending before the Magistrate Judge is Plaintiff's Motion for Judgment on the Administrative Record and Defendant's Response. (Docket Entries 21, 26). The Magistrate Judge has also reviewed the administrative record (hereinafter "Tr."). (Docket Entry 14). For the reasons set forth below, the Magistrate Judge **RECOMMENDS** the Plaintiff's Motion be **DENIED** and this action be **DISMISSED**.

# I. INTRODUCTION

Plaintiff first filed for SSI and DIB benefits on March 13, 2007, with an alleged onset date of September 9, 2006. (Tr. 105-12). Plaintiff's claim was denied initially and on reconsideration. (Tr. 54-57, 41-42). She requested a hearing before the ALJ, which was held on July 15, 2009 before ALJ Joan A. Lawrence. (Tr. 73-74, 16-36). The ALJ issued an unfavorable decision on October 14, 2009. (Tr. 44-53).

In her decision, the ALJ made the following findings of fact and conclusions of law:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2012.
2. The claimant has not engaged in substantial gainful activity since September 9, 2006, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).
3. The claimant has the following severe impairments: low back pain, mild depression (20 CFR 404.1520(c) and 416.920(c)).
4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).
5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work in jobs that do not require climbing ladders, ropes, or scaffolds, more than occasional climbing of stairs and ramps, occasional balancing, stooping, bending, crouching, crawling and kneeling; avoid temperature extremes and humidity; mentally the claimant has limited but satisfactory ability to maintain attention and concentration, social interaction and is able to respond appropriately to changes in the work setting.
6. The claimant is capable of performing past relevant work as a cashier and product assembler. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity. (20 CFR 404.1565 and 416.965).
7. The claimant has not been under a disability, as defined in the Social Security Act, from September 9, 2006 through the date of this decision (20 CFR 404.1520(f) and 416.920(f)).

(Tr. 48-53).

The Appeals Council denied Plaintiff's request for review on March 15, 2010. (Tr. 1-5).

## II. REVIEW OF THE RECORD

Plaintiff was born on October 10, 1962 and was 44 years old at the time of her application. (Tr. 105). Plaintiff completed high school and thereafter earned a one-year certificate in electronics. (Tr. 20). She went into the Army but never completed boot camp; she was discharged for a personality disorder because she was suicidal and depressed. *Id*. Plaintiff has previous work history as a cashier and product assembler, as well as other jobs. (Tr. 21, 34, 52). She is divorced and currently lives with a roommate. (Tr. 24-25). Plaintiff alleges disability as a result of a ruptured disc, migraines, depression, and acid reflux. (Tr. 134).

Plaintiff was treated by Dr. David B. (Brad) Seitzinger, her primary care physician, from 2000 through 2009. (Tr. 245-321, 422-60, 532-46). Plaintiff first saw Dr. Seitzinger for treatment of migraine headaches. (Tr. 293). She first complained of mental problems, including anxiety and fluctuations in mood, on April 19, 2002. (Tr. 290). Plaintiff complained of GERD beginning on May 17, 2002. (Tr. 289). Dr. Seitzinger recommended Plaintiff see a neurologist for neck pain on July 23, 2003. (Tr. 287). On July 15, 2003, Dr. Seitzinger noted Plaintiff could not rotate, hyperextend or flex her neck at all and that she could hardly function. (Tr. 286). At a follow-up appointment on August 22, 2003, Dr. Seitzinger noted that Plaintiff's MRI of the neck was negative, and he stated his belief that this probably represented soft tissue myofascial pain; he decided to forego referring her to a neurologist due to Plaintiff's increasing medical bills. *Id*. He prescribed Vicoprofen and, later, Percocet for Plaintiff's pain. (Tr. 285-86).

On May 2, 2006, Dr. Seitzinger noted Plaintiff suffered from post-traumatic stress disorder related to childhood abuse. (Tr. 263). Suicidal ideation was recorded as a complaint on May 23, 2006. (Tr. 260).

Dr. Seitzinger's notes reflect Plaintiff suffered from a herniated disk on September 13, 2006. (Tr. 257). Plaintiff had an MRI on that date at Cookeville Regional Medical Center, which found a generalized annular posterior disc bulge without exiting nerve root encroachment at T11-12 and a moderately sized focal disc herniation (protrusion) in the left lateral neural foramen at the L4-5 disc space. (Tr. 242-43). On September 27, 2006, Dr. Seitzinger noted Plaintiff suffered from low back pain with radiculopathy. (Tr. 254). Dr. Seitzinger referred Plaintiff to Dr. Cruz on November 25, 2006, to treat her chronic low back pain. (Tr. 251-53).

Plaintiff saw Dr. Leonardo R. Rodriguez-Cruz on October 23, 2006. Dr. Cruz wrote to Dr. Seitzinger and stated that Plaintiff was "quite disagreeable" and "quite short with her answers." (Tr. 240). Dr. Cruz reviewed Plaintiff's MRI and stated that he saw what the radiologist noted on the left neuroforamen at L4/5 "however this is an extremely small mass" and he could not "be sure that this is not signal averaging." (Tr. 241). On November 30, 2006, Dr. Cruz wrote to Dr. Seitzinger and stated he had sent her to Dr. Robert Landry "for a diagnostic as well as a therapeutic selective nerve root block." (Tr. 239). He reported Plaintiff "got three times worse" after the block, which "flies in the face of radiculopathic patterns." *Id*. Dr. Cruz stated Plaintiff "also hit [Dr. Landry] up for pain medication, as she has done me." *Id*. He stated he has "some very significant questions about her pain syndrome," opined Plaintiff is not a surgical candidate, and recommended she be referred to a pain clinic for long-term management. *Id*. On January 26, 2007, Dr. Seitzinger prescribed Oxycodone for Plaintiff's back pain. (Tr. 250).

Plaintiff sought mental health treatment at Volunteer Behavioral Health Care System beginning on May 10, 2007. (Tr. 463-500). At her first appointment, Plaintiff reported she was

4

depressed and had problems with social anxiety. (Tr. 497). She had a history of abuse from her parents and her ex-husband. *Id*. She had been treated for mental health issues approximately twenty years ago. *Id*. Plaintiff was diagnosed with major depressive disorder and began to see a counselor on an approximately biweekly basis. (Tr. 494). On May 10, 2007, her Global Assessment of Functioning ("GAF") score was noted as 50.[1] *Id*. Plaintiff discontinued treatment on November 20, 2007, after discussing whether the sessions were beneficial since Plaintiff had no options to make changes at the time. (Tr. 464).

On June 19, 2007, Linda Blazina, Ph.D. conducted a consulting mental status examination on Plaintiff. (Tr. 328-32). Dr. Blazina reviewed Plaintiff's records from Dr. Cruz. (Tr. 328). After the interview, Dr. Blazina noted Plaintiff exhibited what appeared to be a number of pain behaviors, reported a number of symptoms of depression and anxiety, and had no impairment in her reality testing. (Tr. 331). She noted Plaintiff's memory functioning was intact, though her concentration and attention skills were below average. *Id*. Dr. Blazina concluded Plaintiff's

---

[1] The Global Assessment of Functioning test is a
subjective determination that represents the clinician's judgment of the individual's overall level of functioning. It ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, persistent inability to maintain minimal personal hygiene, or serious suicidal act with clear expectation of death). A GAF score of 31-40 indicates some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) or major impairment in several areas such as work or school, family relations, judgment, thinking or mood. A GAF of 41 to 50 means that the patient has serious symptoms ... OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). A GAF rating of 51 to 60 signals the existence of moderate difficulty in social or occupational functioning.
*Edwards v. Barnhart*, 383 F.Supp.2d 920, 924 n. 1 (E.D.Mich.2005).

ability to understand and remember did not appear to be impaired, but her ability to sustain concentration and persistent was mildly to moderately impaired due to depression and chronic pain issues. (Tr. 332). Plaintiff had mild impairment of her social interaction abilities due to her chronic pain and depression, and her ability to adapt to changes in a work routine and tolerate stress in the workplace were mildly to moderately impaired. *Id*. Dr. Blazina assigned Plaintiff a GAF score of 65. (Tr. 332).

On July 7, 2007, Dr. Jerry Surber performed a consultative examination on Plaintiff. (Tr. 343-47). Dr. Surber reviewed an adult function report, pain questionnaire, and documentation of Plaintiff's visit with Dr. Cruz. (Tr. 343). Plaintiff complained of pain in her left and right neck, both shoulders, and in her lower back and left leg, as well as numbness, burning and tingling in her hands and feet. *Id*. Plaintiff also had a fractured left wrist. *Id*. Dr. Surber noted Plaintiff had no limitation regarding functional mobility nor in her extremities. (Tr. 347). He stated Plaintiff seems to be weaker when standing on her left compared to her right leg, and she has a limping, antalgic gait toward the right, but she uses no assistive device. *Id*. Dr. Surber concluded Plaintiff would be able to occasionally lift or carry at least 10 to 20 pounds during one-third to one-half of an 8-hour workday, could stand or walk with normal breaks for up to 2 to 4 hours in an 8-hour workday or sit with normal breaks for up to 6 to 8 hours in an 8-hour workday. *Id*.

Plaintiff visited Dr. Seitzinger on September 25, 2007, complaining of neck pain, lower back pain, pain in both legs, and a spot on her tongue. (Tr. 435-37). Dr. Seitzinger noted Plaintiff was not suicidal but she had stated she had "no funds or resolution to live." (Tr. 435). He recommended she go to a cardiologist for a nuclear stress test and see a specialist for the spot

6

on her tongue. (Tr. 437). He also noted that Plaintiff "flatly refused to quit smoking despite mouth/tongue lesion which could be cancer." *Id*. Dr. Seitzinger saw Plaintiff the next day for complaints of chest pain. (Tr. 432). Thereafter, Plaintiff was admitted to Cookeville Regional Medical Center for chest pain on September 26, 2007. (Tr. 407-22). A chest CT scan, nuclear stress test, and chest x-ray were all essentially negative for cardiac issues, although some lung disease was noted. (Tr. 416-21).

Plaintiff's records were reviewed by consultant Dr. William L. Downey on December 12, 11, 2007. (Tr. 517-25). Dr. Downey concluded Plaintiff's allegations were partially credible, because there was evidence of back and neck pain and problems. (Tr. 525). Because Plaintiff has fairly normal movement and strength on examination, he would limit Plaintiff to lifting no more than 20 pounds occasionally and 10 pounds frequently, 6 hours standing in an 8-hour workday, and 6 hours sitting in an 8-hour workday. *Id*.

Dr. Seitzinger completed a Medical Source Statement on Plaintiff's behalf on March 17, 2008. (Tr. 528-31). He limited Plaintiff to occasionally lifting and/or carrying less than 10 pounds, frequently lifting and/or carrying less than 10 pounds, standing and/or walking less than 2 hours in an 8-hour workday, sitting about 4 hours in an 8-hour workday, with periodic alternating sitting and standing, and limited pushing and pulling. (Tr. 528-29). Dr. Seitzinger cited Plaintiff's low back pain and MRI showing disc disease as findings supporting his conclusions. Dr. Seitzinger concluded Plaintiff was incapable of even low stress jobs, would need to take more than four unscheduled breaks per day, and would be absent from work more than four times a month as a result of her impairments. (Tr. 529). Dr. Seitzinger also opined Plaintiff should avoid all exposure to extreme cold, extreme heat, vibration, humidity/wetness,

7

hazards, solvents/cleaners, and soldering fluxes, and that she should avoid even moderate exposure to noise, dust, fumes, odors, dusts, gases, perfumes, cigarette smoke, and chemicals. (Tr. 531). Dr. Seitzinger completed a Medical Source Statement with nearly identical limitations on June 3, 2009, based on the 2006 MRI cited in his previous opinion. (Tr. 689-92).

Plaintiff resumed mental health treatment on May 2, 2008. (Tr. 637-74). Plaintiff's GAF on that date was assessed at 45. (Tr. 639). She was categorized in Consumer Group 3, defined as a person who is not recently severely impaired but has been severely impaired in the past and needs services to prevent relapse. *Id*. Plaintiff met with her case manager approximately biweekly. Most of Plaintiff's therapy consisted of addressing her relationship issues and inability to afford medical treatment. Plaintiff ceased case management on November 17, 2008. (Tr. 673).

Plaintiff again sought mental health treatment on December 4, 2008. (Tr. 714-38). Her GAF on March 30, 2009 was assessed at 45, and she was placed in Consumer Group 3. (Tr. 716). Plaintiff's primary goal was to reduce her feelings of stress. (Tr. 717). Plaintiff's last session therapy in the record occurred on June 2, 2009. (Tr. 736). Her case manager noted Plaintiff reported she was doing well with current medications and was "doing alright," with moods that were "ok." *Id*.

On July 15, 2009, Plaintiff testified at her hearing. (Tr. 16-36). Plaintiff testified that she last worked in March 2007 and left because she could not do her job anymore and because she and her boss "had it out." (Tr. 21). Plaintiff later stated she "made a mistake and became friends and you really can't be friends with your boss." (Tr. 31). She has no problems getting along with co-workers. *Id*.

8

Plaintiff testified that she suffered from shooting pain in her legs and back, and she can only walk or stand for approximately 20 minutes before her leg goes numb. (Tr. 22). She sits elevated in the recliner at home. *Id*. Plaintiff stated that her family physician, Dr. Seitzinger, gives her Percocet because she cannot afford treatment. (Tr. 22-23, 26). Without medication her pain is an 8 out of 10; with medication it is approximately 5.5 or 6. (Tr. 26). Plaintiff did not take her medication on the date of the hearing. (Tr. 27). Plaintiff also uses ice to relieve her pain. (Tr. 28). Plaintiff also takes Seroquel and Cymbalta for depression and Trazodone for insomnia. (Tr. 23). Plaintiff testified she also has breathing problems. (Tr. 28-

Plaintiff drew unemployment from approximately September 2006 through January 2007, when she went back to work, and she received unemployment benefits again after she left that job in March 2007. (Tr. 25). She continued to receive unemployment benefits through part of January 2009. *Id*.

Plaintiff testified that she does not drive because she does not own a car. (Tr. 32). She does mow the lawn using a riding mower, and she vacuums the house and does laundry. (Tr. 24, 32-33). Plaintiff heats microwave meals because she does not know how to cook. (Tr. 32). She uses the computer once per day. *Id*. She goes grocery shopping only when she has to, because it wears her out. (Tr. 31).

The Vocational Expert ("VE"), Jo Ann Bullard, testified that Plaintiff's past skilled work would not be transferable to sedentary or other light work. (Tr. 35). The ALJ posed a hypothetical individual with the same work history and educational background but who was restricted to light exertional level; could not climb ladders; could occasionally climb stairs, balance, stoop, bend, crouch, crawl, or kneel; must avoid extreme temperatures and humidity;

9

and has a limited but satisfactory or mild problem with concentrating, social interaction, and responding appropriately to changes in the work setting. *Id*. The VE testified that Plaintiff could return to her previous light work, including Cashier II, production assembler, top setting machine tender, and production supervisor. (Tr. 34-35). The ALJ next posed a hypothetical individual with the same restrictions but with an additional restriction to the sedentary exertional level. (Tr. 35). The VE stated that the second hypothetical individual would be able to work in sedentary, unskilled occupations, including surveillance system operator/monitor, charge account clerk, and hand bander. (Tr. 35-36). The ALJ next directed the VE to Dr. Seitzinger's restrictions, which included the inability to complete an 8-hour day on a regular basis. (Tr. 36). The VE stated there would be no work that a hypothetical individual could do with that restriction. *Id*.

### III. PLAINTIFF'S STATEMENT OF ERROR AND CONCLUSIONS OF LAW

Plaintiff cites three alleged errors committed by the ALJ for review. First, the ALJ erred in rejecting the opinion of treating physician Dr. Seitzinger. Second, the ALJ erred in rejecting the reports and assessments of her treating psychologists. Third, the ALJ erred in discounting Plaintiff's complaints of disabling pain.

A.  <u>Standard of Review</u>

This Court's review of the Commissioner's decision is limited to the record made in the administrative hearing process. *Jones v. Secretary*, 945 F.2d 1365, 1369 (6th Cir. 1991). The purpose of this review is to determine (1) whether substantial evidence exits in the record to support the Commissioner's decision, and (2) whether any legal errors were committed in the process of reaching that decision. *Landsaw v. Secretary*, 803 F.2d 211, 213 (6thCir. 1986).

"Substantial evidence" means "such relevant evidence as a reasonable mind would accept

as adequate to support the conclusion." *Her v. Commissioner*, 203 F.3d 388, 389 (6th Cir. 1999) (*citing Richardson v. Perales*, 402 U.S. 389, 401 (1971)). It has been further quantified as "more than a mere scintilla of evidence, but less than a preponderance." *Bell v. Commissioner*, 105 F.3d 244, 245 (6th Cir. 1996). Even if the evidence could also support a difference conclusion, the decision of the ALJ must stand if substantial evidence supports the conclusion reached. *Her*, 203 F.3d at 389 (*citing Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)). However, if the record was not considered as a whole, the Commissioner's conclusion is undermined. *Hurst v. Secretary*, 753 F.2d 517, 519 (6th Cir. 1985).

B.    Proceedings at the Administrative Level

The Claimant has the ultimate burden to establish an entitlement to benefits by proving his or her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). At the administrative level of review, the claimant's case is considered under a five-step sequential evaluation process as follows:

1. If the claimant is working and the work constitutes substantial gainful activity, benefits are automatically denied.

2. If the claimant is not found to have an impairment which significantly limits his or her ability to work (a "severe" impairment), then he or she is not disabled.

3. If the claimant is not working and has a severe impairment, it must be determined whether he or she suffers from one of the "listed" impairments[2] or its equivalent; if a listing is met or equaled, benefits are owing without further inquiry.

4. If the claimant does not suffer from any listing-level impairments, it must be determined whether the claimant can return to the job he or she previously held in

---

[2] The Listing of Impairments is found at 20 C.F.R., Pt. 404, Subpt. P, Appendix 1.

> light of his or her residual functional capacity (*e.g.*, what the claimant can still do despite his or her limitations); by showing a medical condition that prevents him or her from returning to such past relevant work, the claimant establishes a *prima facie* case of disability.
>
> 5. Once the claimant establishes a *prima facie* case of disability, it becomes the Commissioner's burden to establish the claimant's ability to work by providing the existence of a significant number of jobs in the national economy which the claimant could perform, given his or her age, experience, education, and residual functional capacity.

*Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

In determining residual functional capacity (RFC) for purposes of the analysis required at steps four and five above, the Commissioner is required to consider the combined effect of all the claimant's impairments, mental and physical, exertional and nonexertional, severe and non-severe. *See* 42 U.S.C. § 423(d)(2)(B).

C.  The ALJ Properly Evaluated Dr. Seitzinger's Opinion

Plaintiff argues the ALJ erred by rejecting treating physician Dr. Seitzinger's opinion that Plaintiff could perform less than sedentary work. An ALJ should give enhanced weight to the findings and opinions of treating physicians since these physicians are the most able to provide a detailed description of a claimant's impairments. 20 C.F.R. § 404.1527(d)(2). Further, even greater weight should be given to a physician's opinions if that physician has treated the claimant extensively or for a long period of time. 20 C.F.R. § 404.1527(d)(2)(i)-(ii). However, if there is contrary medical evidence, the ALJ is not bound by a physician's statement and may also reject it if that statement is not sufficiently supported by medical findings. 20 C.F.R. § 404.1527(d); *Cutlip v. Secretary of H.H.S.*, 25 F.3d 284 (6th Cir. 1994).

While the ALJ is not bound by the opinions of Plaintiff's treating physicians, the ALJ is required to set forth some sufficient basis for rejecting these opinions. *Shelman v. Heckler*, 821

F.2d 316, 321 (6th Cir. 1987). In discrediting the opinion of a treating source, the ALJ must consider the nature and extent of the treatment relationship, the length of the treatment relationship and the frequency of examinations, the medical evidence supporting the opinion, the consistency of the opinion with the record as a whole, the specialization of the treating source, and any other factors which tend to support or to contradict the opinion. 20 C.F.R. § 404.1527(d)(2); *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541 (6th Cir. 2004).

Here, the ALJ properly rejected Dr. Seitzinger's opinion regarding Plaintiff's ability to perform substantial gainful activity. The ALJ correctly stated that Dr. Seitzinger's office notes were not incredibly informative. "The notes primarily contain the claimant complaints which varied throughout the period, vital signs such as blood pressure and rate of respiration, weight, etc. The remainder of the notes contain only check marks noting either normal or abnormal next to the various body systems." (Tr. 50). Additionally, most of the check marks were normal, with the exception of musculoskeletal, which was consistently checked abnormal "but with no explanation, elaboration or objective findings." *Id*. The ALJ also noted that Dr. Seitzinger recommended limitations on the use of Plaintiff's upper extremities for gross and fine manipulation and described a complete inability to climb stairs, both of which have no basis in Plaintiff's medical records. (Tr. 530). This is a reasoned rejection of Dr. Seitzinger's opinion. *Ferguson v. Commissioner*, ___ F3d ____(6${}^{th}$ Cir Slip Opinion No. 09-4387 filed Dec 23, 2010).

The ALJ relied instead on Dr. Cruz's opinion that Plaintiff's 2006 MRI failed to show a herniated disc and that Plaintiff's complaints were inconsistent with radiculopathy. (Tr. 49). While Dr. Seitzinger had a far longer treating relationship with Plaintiff, he relied solely on the 2006 MRI as objective evidence of Plaintiff's physical limitations. Because Dr. Cruz, a

13

neurosurgeon, discounted the MRI and concluded Plaintiff's symptoms were not consistent with radiculopathy, the ALJ had substantial evidence for her rejection of Dr. Seitzinger's opinion and medical source statement. As the ALJ also noted, Dr. Surber's consulting report, which was well-detailed and documented, was consistent with Dr. Cruz's opinion.[3]

D.      The ALJ Properly Evaluated Plaintiff's Psychological Restrictions

Plaintiff contends that the ALJ improperly rejected the reports of her treating psychiatrist and counselor. When a claimant alleges disabling mental impairment, an ALJ is required to evaluate first whether the claimant has a "medically determinable mental impairment" and then to rate the "degree of functional limitation resulting from the impairment." 20 C.F.R. § 404.1520a. The ALJ must evaluate the so-called "A" criteria, consisting of the "symptoms, signs, and laboratory findings" of the claimant's alleged medically determinable mental impairment. *Id.* The ALJ must also evaluate the "B" criteria, which rate the claimant's degree of functional limitation and consist of four functional areas: "[a]ctivities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation." *Id.* The ALJ's application of these criteria must be documented in her decision. *Id.*

Here, the ALJ appropriately described her evaluation of both the "A" and "B" criteria. As an initial matter, the ALJ appeared to find initially that Plaintiff's mild depression was a severe impairment, but later concluded it was a mild impairment. (Tr. 48, 52). In evaluating the "A" criteria, the ALJ placed great importance on the fact that, with the exception of Plaintiff's primary care physician and mental health counselors, no other treating or consulting physicians noted

---

[3] The only treating source whose opinion arguably supported Dr. Seitzinger's assessment was Dr. Roseanne Ellis, Plaintiff's chiropractor. The regulations clearly state that a chiropractor is not an "acceptable medical source." 20 C.F.R. § 404.1513(d).

Plaintiff appearing to suffer from depression or mental illness. (Tr. 51). The Magistrate Judge is not entirely convinced by this argument, because Plaintiff apparently saw these providers a limited number of times for unrelated ailments. The Magistrate Judge does believe, however, that the ALJ had substantial evidence for her evaluation of Plaintiff's psychological restrictions as mild. Plaintiff's mental health treatment records show that, at her last visit in June 2009, she was doing well and had seen improvement with medication. (Tr. 736). Plaintiff's GAF scores were assessed at 45 and 50. (Tr. 494, 639). Dr. Blazina, the consulting expert, assessed Plaintiff's GAF at 65, which equates to mild mental limitations. (Tr. 332). Dr. Blazina also assessed Plaintiff's mild to moderate limitations as a result of combined chronic pain and depression. (Tr. 332).

With regard to the "B" criteria, the ALJ described Plaintiff's activities of daily living and noted that she is able to drive a car, prepare meals appropriate to her cooking skill, and do housework. (Tr. 49). Plaintiff also testified that she has no problems getting along with coworkers, although she "had it out" with her boss at her last job. (Tr. 31). The ALJ therefore had substantial evidence to conclude Plaintiff "has no limitations in activities of daily living, mild limitations in social functioning, mild limitations in concentration, persistence or pace and no episodes of decompensation." (Tr. 52).

E. The ALJ Properly Assessed Plaintiff's Credibility

The ALJ found that Plaintiff's "statements concerning the intensity, persistence and limiting effects of [her] symptoms [were] not credible," based on her level of independent functioning and the record as a whole. (Tr. 50). An ALJ's finding on the credibility of a claimant is to be accorded great weight and deference, particularly since the ALJ is charged with the duty of observing the witness's demeanor and credibility. *Walters v. Commissioner of Social Security*,

15

127 F.3d 525 (6th Cir. 1997) (citing 42 U.S.C. § 423 and 20 C.F.R. 404.1529(a)). Further, discounting the credibility of a claimant is appropriate where the ALJ finds contradictions from medical reports, claimant's other testimony, and other evidence. *Id*. Like any other factual finding, however, an ALJ's adverse credibility finding must be supported by substantial evidence. *Doud v. Commissioner*, 314 F. Supp. 2d 671, 678-79 (E.D. Mich. 2003).

Here, Dr. Cruz expressed doubts about the severity of Plaintiff's pain and intimated she was engaging in drug-seeking behavior. (Tr. 239). In addition, Plaintiff testified she was able to use the computer and riding lawnmower, and she assessed her pain level at 5-6 when taking medication. (Tr. 26, 32-33). Finally, Plaintiff received unemployment benefits during her period of alleged disability, as late as January 2009. (Tr. 25). As the ALJ points out, receiving unemployment benefits is essentially an acknowledgment Plaintiff was not disabled at this time. (Tr. 51). The Magistrate Judge therefore believes the ALJ had sufficient evidence for discounting the credibility of Plaintiff's statements.

## IV. RECOMMENDATION

In light of the foregoing, the Magistrate Judge **RECOMMENDS** that Plaintiff's motion for judgment be **DENIED**.

Any party has fourteen (14) days from receipt of this Report and Recommendation in which to file any written objection to it with the District Court. Any party opposing said objections shall have fourteen (14) days from receipt of any objections filed in which to file any responses to said objections. Failure to file specific objections within fourteen (14) days of receipt of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation. *Thomas v. Arn*, 474 U.S. 140 (1985); *Cowherd v. Million*, 380 F.3d 909, 912

(6th Cir. 2004) (en banc).

ENTERED this 23rd day of December, 2010.

/S/ Joe B. Brown
_____
JOE B. BROWN
United States Magistrate Judge